Our second argument of the day is in Appeal 24-19-03, the United States v. Lapierre Scott. Okay, Mr. Greenberg, nice to see you whenever you're ready. Good morning. I have to say that this is a factual situation that I never thought, when I went to law school, that I was ever going to encounter, whether you would have to lock a bathroom door. And when I was thinking about this argument, and I was talking to my wife about it yesterday, I was thinking of the opening scene from the movie Planes, Trains, and Automobiles, where Steve Martin and John Candy are running for the cab. I was thinking of it as if you're running for the bathroom door somewhere, and the two people are running. And if two people ran for the same bathroom, and it was a single-user bathroom, and someone beat the other person to the bathroom, the person who didn't make it to the bathroom wouldn't then burst in, just because they didn't hear the door lock. And that's really what we have here. We have a ruling by the trial court that just because somebody didn't lock the bathroom door, society does not recognize a privacy interest in the bathroom. But here, the bathroom's also out of order. So we have a privacy interest. The courts have talked about privacy interests in various places. But is this even really about a single-stall bathroom, or is this about just any other room in a gas station, because the bathroom's out of order? Well, the bathroom may have had an out-of-order sign on it. We don't know what was wrong with the bathroom. And the trial court didn't really place much emphasis on the fact it was out of order, except it said someone else could have come in at any time to fix the bathroom. But that's not really important here, because the person who's using the bathroom, and I hate to get graphic here, although we sort of did in our brief, they don't care if the bathroom's out of order, frankly. If you've got to go, you've got to go, right? And you don't care what you're leaving behind for the person afterwards. So if you've got to go to the bathroom, you're either going to go to the out-of-order bathroom, or you're not going to go in the aisle. You're not going to pull up behind the gas station and risk getting arrested for public indecency. You're going to go in the only place you can go. And you don't care if you can't flush the toilet. And if the toilet's not working, maybe you're going to go, frankly, in the sink. That really doesn't matter. It's a bathroom, and you have to assume that somebody goes in a bathroom to use a bathroom as a bathroom is intended. Whether they can flush the toilet or not, whether they can wash their hands, doesn't matter. It doesn't give a police officer – they're not a hygienist. It's not up to them to check the toilet paper roll or something like that. Just change the fact pattern in one small way. Take that sign and change it. And have the sign say, closed, do not enter. Same analysis? Yes, it's the same analysis, because it's none of the police officer's business. The stipulation at the hearing was that they had no reasonable suspicion. They had no probable cause. So why are they going in there? They had no reason to go in there. They weren't going in there because they suspected a trespass. So they had no reason to go in there. And when the trial court said, well, a plumber could have gone in there, someone from the gas station could have gone in there, sure, someone from FedEx can open a package that a police officer can't open. Someone from the geek squad can look on a computer that a police officer needs a warrant to look at. But a police officer is different. They are a government actor. So it sounds like you're – I think this is in your brief, or it's between the lines anyway. Your point is, okay, fine, they want to talk to Mr. Scott about the robbery. Wait outside, stand outside the bathroom door. I mean, where do you think he's going? Right, and they didn't even say they wanted to talk to him about the robbery. Well, this business, whatever this thing's called, field interview or something, I mean, they want – whatever that means, they wanted to talk to him about something. They wanted to talk to him, but they never said why they wanted to talk to him. This record's silent as to why they wanted to talk to him. The fact is that they saw him go in there, and for some reason they followed him. There's really no reason in this record. I thought they were – maybe I'm wrong. We'll see what the government says. I thought they were making a call on the place because it got stuck up earlier in the day. So in the morning there's a robbery at the gas station, and at the hearing, which was a stipulated hearing, it was during COVID, so we stipulated to the facts. We stipulated that the police didn't have probable cause or reasonable suspicion, that they saw him walk into the bathroom, that the door was closed, that they had no reason to suspect he was doing anything illegal, and that there was the out-of-order sign. Yeah, fair enough, but they weren't just swinging by the, what was it, a golf quick mart or something to get a cup of coffee, right? Weren't they – they were in a radio car, and weren't they aware there was a robbery there earlier? They were going to get video. They were going to collect the video from earlier in the day. When we had the trial in the case, one of the officers said that when he looked at Mr. Scott, he thought he fit the description of the robber from earlier, and the government put that in their brief. But if you look at the cross-examination, he really didn't. The only similarity was that he had on a multicolored jacket. The rest of his clothing didn't fit the description. His complexion didn't fit. His facial hair didn't fit. In fact, the description from earlier wasn't even whether it was a male or female, and eventually the witness conceded that he didn't have any reason to believe he was involved in the earlier robbery. So there's really no reason in this record why they wanted to talk to him. They just saw somebody who, when they approached, walked away from them, which is not an uncommon occurrence. And if you watch the video, he doesn't even walk away in a fast manner or anything like that. There's nothing really suspicious about the way he walks away from them. Really, the touchstone of the Fourth Amendment in all of these cases, and I know that the trial court went through an analysis, which this court talked about recently in U.S. v. Planker, 105, Fed Fourth, 996, the property-based approach and the privacy-based approach. But then the court said that the touchstone of the Fourth Amendment is reasonableness, and nothing's more reasonable than when someone goes into the bathroom and you see them go into the bathroom, you don't follow them in. And it's that simple. You just don't follow them in. It's just common courtesy, and I don't know how else to put it. There are cases that the government has cited where courts have found that police officers can conduct searches in bathrooms. In every one of those cases, something is different. There is a case that they cite in De La Sera, where the court found that Mr. De La Sera didn't do anything to manifest an expectation of privacy. In Boynton, the officers who entered the bathroom didn't know it was occupied. Here they knew it was occupied. Obviously, if you don't know a bathroom is occupied, then someone can have an expectation of privacy, or the officers aren't violating an expectation of privacy if they don't know it's occupied. The other case that they cite, the door was open. So no one has an expectation of privacy if the door is open. If you look, there are cases where people are in toilet stalls, and you see the feet in the stall, and the courts say there's an expectation of privacy in the stall. But if you can see through the crack into the stall, there's no expectation of privacy what you can see through the crack. There are cases that say that if you can see in a window into a bathroom, there's no expectation of privacy. But if you have to climb up somewhere to see into the window, then there is an expectation of privacy. Here you're in a closed bathroom. It can't be any clearer. I don't know. Are there any other questions? No. I mean, we get it. You're perfectly clear. Okay, we'll give you the rebuttal time if you need it, though. Okay. Yep. All right, let's hear from the government. Good morning, Your Honors. Starting with the last point that he's making. Everything in his argument seems to turn on the officer seeing him go into the bathroom. And I think he almost conceded that if the officers hadn't seen him go in, he wouldn't have an expectation of privacy. That's not how the analysis works. The analysis under Plancart, under Lewis, it's a two-step analysis, and it shows that a defendant does not have an expectation of privacy protected by the Fourth Amendment in an unlocked, out-of-order public bathroom. The first step is, is there a subjective expectation of privacy? And there is not when you don't even bother to lock the door because anyone could have entered, as the court recognized. And the main factor that this court and other courts point out that goes to the subjective expectation of privacy is whether they made any effort to protect themselves, to protect that thing. So in Boynton, for example, the cases he just cited, Delacera and Boynton, in Delacera, the door is just shut. I mean, it's not locked, and the court says by not locking that door, when they came in, when the officers came in and saw the drug deal going down, they might as well have been doing it in a public street because anyone could have shown up and opened that door. In our case, what if the police officers, what if those officers hadn't seen him and walked past that door, and it was the other officers who came in later, or a store clerk or anyone who didn't see him go in and open the door? All of a sudden, he has a right to privacy, not under the case law. And in Boynton, in Boynton, I think it's almost exactly like this case because in Boynton, he's actually even pushing. There's two people happen to be in this single occupant stall, and one of them is pushing against the door, and the officers push through, and the court says, he didn't ask that guy to hold the door shut. He didn't do anything to protect his privacy. I think in that case, the door didn't even have a lock on it. So the bottom line here is there's been no effort by this defendant to ensure his privacy in an unlocked, out-of-order bathroom. And then even if he did have a subjective interest, there is one case out of the New York State court that says even just a shut door gives you an expectation of privacy, presumably at least a subjective one. Even if that were the case, as the district court found here explicitly, it doesn't apply for Shirley when it's an out-of-order bathroom. Now, it may be true that if you really have an emergency and you have to go and you run in there, sure, you have to go, you run in there, but you know what? You know anybody could be coming in because it's not locked and it says out-of-order. So you may be doing your emergency thing, but you've lost that sanctity of righteous privilege that the defense is talking about when you go into an out-of-order bathroom. And in fact, the police officers noted in particular during their testimony at trial, it was unlocked and it said out-of-order. So, you know, their presumption, rightly so as a matter of fact, was that it wouldn't be used for this private expiratory function. So it sounds like what you're saying is, look, before you know it, the federal reporter is going to have a whole bunch of bathroom cases in it. Let's just take them one at a time. You know, no broad categorical rules. That's very antithetical to the way the Fourth Amendment works. But I think as Judge Lee pointed out when he made this, or the court pointed out when it made this ruling, that is how the Fourth Amendment works, at least in this context. So there's two kinds of approaches, right, as this court has recognized, and in Placard in particular, as the defense counsel said. There's the property-based approach. And that's what applied to the package she's talking about, or to the hotel room that the maid can go into. It's based on you have a property interest there, and that gives you extra protection. You don't have to come in here and establish your privacy right. But then there's the privacy approach. And the privacy approach has this, was there a subjective expectation, and was that expectation reasonable? And as the court said, I'm not making a blanket ruling here that every time someone doesn't lock a door to a bathroom, there's now not a privacy interest. What I'm saying is, what the court is ruling, not saying, but ruling is, that when it's an out-of-order bathroom in a public space, and it's not locked, you do not have a protected Fourth Amendment interest. Yeah. Look, there's definitely a difference between the parties on the application of law to fact here, but there's not that much difference in terms of the privacy-based strand of Fourth Amendment law in bathrooms. Because Mr. Greenberg is right, we can hypothesize, and I'm sure you'd agree, all kinds of fact patterns where there's a Fourth Amendment violation involving a bathroom. Sure. Plenty of them. Of course there are. And I would say, Your Honor, to your point about it being nuanced, when you look at the stall cases, they're very nuanced. What you can see from the general area, you know, in the cases we cite in the brief, they're all nuanced. So I give that it's nuanced. But the nuance here all points to the defendant having no privacy interest in that bathroom. I mean, this may be even nuanced in one additional way, that it's a single occupant bathroom. And your briefs are very good on this. I mean, it's very clear from the fact pattern, but it may be different if it's not. It may be. If it just has a little picture of a man or whatever there.  You know, you think, well, it's not clear to me. It's single occupant, so I'm going to walk on in. Well, and that's the other point here. How is this clear that it was single occupant? If you look at the video, which we've supplemented the record with, I'm not saying this wasn't single occupant. It absolutely was. And there was another bathroom that didn't have an out-of-order sign that he could have gone into first, which I think is also telling here. Well, that's a fact that's helpful to him. But I think it's clear from that little sign on the door that has like a man slash woman, that it's a single occupant. Oh, I didn't. Forgive me, Your Honor, because I didn't notice that in the video. You know what I mean? The little picture on the door of the bathroom. I just remember the out-of-order sign. So I guess when I saw it, I didn't focus on that. So maybe it does show that, in which case it does indicate it's single occupancy. But I would say in this case, it's irrelevant. It's irrelevant because it had an out-of-order sign. It's irrelevant because he didn't lock the door. And I guess what concerned me here is any analysis that now focuses on whether he was seen going in. Because that is a step in the analysis that seems to be the crux of his argument that, yes, there's mention. He'll be able to come back here and tell you, but it's mentioned in this case that they saw him go in. That may be the case. But in none of these cases is that a major function in the analysis, nor in cases where he's not seen to go in, does it function to go in the analysis. And it just seems that whether you have a right to privacy in a situation cannot turn on who happens to observe. Because if it does, then the whole idea of a subjective and objective, that test doesn't make any sense. And I would just also add in one other point, and I think we've made it clear in our brief in the cases we cite, the burden in this to adduce facts that he thought served him or to put them in issue was on the defendant. It was not on the government. Because the burden for the protected right is on the defendant. Once that right's established, it's definitely the government's burden to show an exception or to show that his rights weren't violated. But establishing the right was on the defendant. So unless the court has any other questions, the government would ask that you respectfully affirm the conviction and sentence. Okay, thank you, Mr. Greenhalgh.  And I just want to point out by focusing on this argument, we're not certainly abandoning the other two arguments. This is just more interesting to argue. Yeah, sufficiency and there's something. Oh, the Second Amendment. The Second Amendment, which I think the court has probably heard enough times and I think has a case that it's considering. You know, when counsel says that, well, first of all, before I get into it, my associate pointed out that the government conceded in their opening statement at the trial that Mr. Scott did not fit the description of the alleged robber, although the witness then tried to make it sound like he did. So I don't even think that was an issue at the trial. But the government talks about whether Mr. Scott expected anyone to come in or not. Mr. Scott was certainly engaged in activity when the officers did go in, which would be indicative of someone who did not expect anyone to come into the bathroom. He would not be hiding something in the ceiling if he was expecting people to walk in the bathroom. I know that the district court judge said that he was hiding something in the ceiling, which showed that he expected someone to come in the bathroom. I think he was hiding something in the ceiling because he expected that when he was going to come out of the bathroom, that since there were police officers there, he expected they would do what they often do on the West Side, which is search people randomly. Counsel said something about he didn't do anything. He didn't make any effort to protect his privacy when he went in the bathroom. Well, he did. He shut the door. That's what people do when they go in the bathroom. That's how they protect their privacy. Then she said, well, what if the officers didn't see him go in the bathroom and officers who came in later had come in and then they had walked in and they had gone and opened up the bathroom door. I think we'd have a weaker position if that were the case, but that's not the case. We could have all sorts of hypotheticals about what ifs and what if some patron had just opened the door and seen him doing that and then called over an officer and said, hey, look what this guy is doing. And then we wouldn't be here at all. But doesn't that all go to whether or not there's a subjective expectation of privacy? Well, sure, except we're dealing with what the police officers saw. And police officers, just like they benefit in cases by their observations, they're also constrained by their observations. And here their observations were that they saw him go into the bathroom. So they can't now say, well, what if we didn't see him go into the bathroom? Then in that scenario, this search would be perfectly lawful. They can't say that. You know, just like they can't say when they burst into a house without a warrant, well, what if we did have a warrant? Then the search would be perfectly lawful. I mean, we can't deal in those kinds of hypotheticals. That's not how we look at these cases. The fact is that they saw him go in, and then they went bursting in after he went in. And I don't think that we want a precedent that says that the police can do that. If there's any further questions? Okay. Mr. Greenberg, am I right? I see here on our calendar cue that you accepted this on appointment. Yes, Your Honor. Yeah, we very much appreciate that. You've done a fine job for Mr. Scott. Thanks to your colleague as well, as always, to the government. And we'll take the appeal under advisement. Thank you.